# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-836V**

|  |  |
|---|---|
| CORINN DARBY, *as the personal representative of* JOHN R. DARBY, *her deceased husband*, <br><br>          Petitioner, <br><br> v. <br><br> SECRETARY OF HEALTH AND HUMAN SERVICES, <br><br>          Respondent. | Chief Special Master Corcoran <br><br> Filed: June 15, 2026 |

*Curtis R. Webb, Curtis R. Webb Attorney at Law, Monmouth, OR, for Petitioner.*

*Alexis B. Babcock, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION GRANTING AWARD OF ATTORNEY'S FEES AND COSTS[1]

On July 9, 2020, Corinn Darby filed a petition for compensation on behalf of her deceased husband, John R. Darby, under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged (under the Vaccine Act Table) that Mr. Darby suffered from Guillain-Barré syndrome ("GBS"), which led to his death by suicide, as a result of an influenza ("flu") vaccine he received on December 11, 2017. Pet. at 1-2.

The case was dismissed, and Petitioner has now moved for a final award of fees. For the reasons set forth below, I find that Petitioner has established a reasonable basis for this claim. Thus, she is entitled to an award of attorney's fees and costs.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

I.        **Relevant Procedural History and the Parties' Arguments**

Following a medical review of this case, Respondent filed his Rule 4(c) Report setting forth his objections to Petitioner's eligibility for compensation. ECF No. 38. Respondent argued that the onset of Mr. Darby's GBS did not occur until approximately February 13, 2018 (at the earliest) – *more than two months* (nine weeks) after vaccination, and thus well outside the Table's 3-42 day window. *Id.* at 12-13 (internal citations omitted). Additionally, Respondent asserted that there was evidence showing that Mr. Darby may never have actually experienced the Table-defined version of GBS, as his treaters suspected and/or could not rule out other neurological diagnoses (including neuropathy), and possible alternative causes of his condition existed (e.g., a preceding upper respiratory infection ("URI")). *Id.* at 12.

I thereafter issued an Order to Show Cause in response to the Rule 4(c) Report. *See generally* ECF No. 40 (internal citations omitted). I concluded by warning Petitioner that the objections Respondent had raised suggested dismissal of *at least* Petitioner's Table claim was appropriate unless Petitioner could better substantiate it. *Id.* at 7. I afforded Petitioner an opportunity to submit additional evidence showing that the onset of GBS could occur so long after vaccination in the off-Table context, and invited her to address the potential alternative diagnoses evident from the record. *Id.*

Petitioner filed a responsive document thereafter. ECF No. 42. While not submitted as a Motion to Voluntary Dismiss (pursuant to Vaccine Rule 21(a)), Petitioner stated that upon a further review of the record and applicable case law, she had "concluded that she w[ould] not be able to demonstrate a proximate temporal relationship between Mr. Darby's [flu] vaccination and the onset of his GBS," and therefore requested dismissal of her claim. *Id.* at 1. Nonetheless, Petitioner noted the existence of medical literature commonly submitted in the Program that has persuaded *other special masters* that an onset occurring nearly 64 days post vaccination (as seen in Mr. Darby's case) could be medically acceptable. *See id.* at 3-4 (internal citations omitted); Schonberger L., et al., *Guillain Barre Syndrome following vaccination in the National Influenza Immunization Program, United States*, Am. J. Epidemiology, 100:105-123 (1979) ("Schonberger") (finding a modestly increased incidence of GBS up to 10 weeks after swine flu vaccination). Petitioner acknowledged, however, that I *personally* have previously not been persuaded that such a lengthy timeframe is viable. *Id.* at 4. As requested, I issued a Decision Dismissing Petitioner's claim on October 25, 2024. ECF No. 43. Judgment entered on December 5, 2024. ECF No. 45.

On June 3, 2025, Petitioner subsequently filed a request for an award of $36,050.55 in attorney's fees and costs. Motion for Attorney's Fees and Costs, ECF No. 48. Petitioner seeks $31,472.75 in attorney's fees, and $4,577.80 in paralegal fees. *Id.* at

2

2. Petitioner argues that even though she conceded she could not establish a proximate temporal relationship for Mr. Darby's GBS injury that occurred 64 days post vaccination, this claim was brought with good faith and a reasonable basis. *Id.* at 5-7. Specifically, Petitioner reiterates her reliance on the medical literature[3] cited in her Response to my Order to Show Cause as supporting the conclusion that GBS onset as far as ten weeks post vaccination can be caused by a flu vaccine. *Id.* at 5-6. Petitioner further relies on Program decisions[4] where she *contends* that other special masters have cited certain items of literature, like Schonberger, to conclude that "the onset of GBS within 60 days of an influenza vaccination supported an inference of causation." *Id.* at 6.

Respondent reacted to Petitioner's request on June 12, 2025. Response, ECF No. 49. Respondent maintains that Petitioner lacked a reasonable basis for her claim. *Id.* at 1. Specifically, Respondent relies on Mr. Darby's medical records that unquestionably established an onset occurring nine weeks post vaccination, making the claim facially "unfeasible" and "unreasonable" based on existing Program case law.[5] *Id.* at 11. And if reasonable basis is ultimately found in Petitioner's favor, a reduction in fees would still be warranted, Respondent argues, as the amount sought for the collection of medical records and responding to an Order to Show Cause is "excessive given the tasks involved." *Id.* at 12.

Petitioner replied to Respondent's arguments in late June 2025. Reply, ECF No. 50. Petitioner maintains her argument regarding an acceptable onset for the onset of GBS following receipt of a flu vaccine, and that the vaccine was likely a substantial factor in Mr. Darby's death by suicide – because of both his GBS and his IVIG treatment. *See id.* at 1-7. Petitioner also reduces her request for attorney's fees by $9,529.80, to $26,520.75. *Id.* at 8. In support of this change, Petitioner notes that "her attorney accomplished very

---

[3] While Petitioner also cited a second medical study commonly discussed in other decisions in conjunction with the Schonberger study, Petitioner's briefing and argument centered around the Schonberger study only. *See,* e.g., Mot. at 5-7 (citing Langmuir D., et al., *An epidemiological and clinical evaluation of Guillain-Barre Syndrome reported in association with the administration of swine influenza vaccines,* Am. J. of Epidemiology, 119:841 (1984)).

[4] *Pierson v. Sec'y of Health & Hum. Servs.*, No. 17-1136V, 2022 WL 322836 (Fed. Cl. Spec. Mstr. Jan. 19, 2022); *Redzepagic v. Sec'y of Health & Hum. Servs.*, No. 19-853V, 2025 WL 1147520 (Fed. Cl. Spec. Mstr. Mar. 19, 2025); *Cooper v. Sec'y of Health & Hum. Servs.*, No. 18-1885V, 2024 WL 1522331 (Fed. Cl. Spec. Mstr. Mar. 12, 2024).

[5] *Chinea v. Sec'y of Health & Hum. Servs.,* No. 15-95V, 2019 WL 1873322, at *29 (Fed. Cl. Spec. Mstr. Mar. 15, 2019) (finding that eight weeks is the longest timeframe deemed reasonable for GBS following receipt of a flu vaccination); *Barone v. Sec'y of Health & Hum. Servs.*, No. 11-707V, 2014 WL 6834557, at *13 (Fed. Cl. Spec. Mstr. Nov. 12, 2014) (noting "special masters have never gone beyond a two-month (meaning eight week) interval in holding that a vaccination caused a demyelinating illness"); *De La Cruz v. Sec'y of Health & Hum. Servs.*, No. 17-783V, 2018 WL 945834, at *1 (Fed. Cl. Spec. Mstr. Jan. 23, 2013) (finding that the onset of GBS more than two months after receipt of a flu vaccine is not compensable in the Program).

little between the filing of her petition [] on July 9, 2020, and September 20, 2023, when her attorney received the Order to Show Cause[;]" thus she alleges that her attorney is not requesting fees incurred in that nearly three-year period. *Id.*

## II.        Abbreviated Factual Synopsis

It is not disputed that Mr. Darby received the subject flu vaccine on December 11, 2017. The petition and Petitioner's affidavit reflect that, post vaccination, while at a medical conference in Hawaii for anesthesiology, "[d]uring the evening of [] February 13, 2018[, Mr. Darby] complained [to Petitioner] of an odd feeling in his legs as he was walking downstairs[.] He looked at his legs in confusion and said that they felt weird and unsteady." Pet. ¶ 9; Ex. 1 ¶ 12.

The "weird feeling in his legs" returned "[l]ater in the week" while driving. Pet. ¶ 10; Ex. 1 ¶ 14. Mr. Darby "complained that he couldn't get his legs into a comfortable position and had to pull over so that [Petitioner] could drive." Pet. ¶ 10; Ex. 1 ¶ 14. While traveling home from the conference on February 17, 2018, Mr. Darby's "legs continued to feel strange." Pet. ¶ 11. According to Petitioner, Mr. Darby continued to complain that he "didn't feel right and that his legs felt buzzy" for "the next two weeks[.]" *Id.*

Email correspondence reveals that on February 19, 2018, Mr. Darby cancelled his attendance at an upcoming conference due to a "family illness that will prevent us from travelling [sic]." Ex. 13 at 4. Three days later, on February 22, 2018, emails show that Mr. Darby was working from home that day due to the "flu or some variation there of [sic]." *Id.* at 6. The next day, February 23, 2018, Mr. Darby sent an email noting he had "a touch of the crud all week and [was] feeling a bit better." *Id.* at 5.

On March 1, 2018, after feeling lightheaded and nearly fainting at work, Mr. Darby presented to the emergency department reporting that he "was feeling his normal self yesterday[,]" but "[w]oke up [] with some leg fatigue and lightheadedness" that worsened throughout the day. Ex. 5 at 3; Pet. ¶ 12. He also reported leg weakness. Ex. 5 at 3. Mr. Darby indicated "no history of similar episodes" but noted a recent URI last week that had resolved. *Id.* Upon a review of systems, Mr. Darby noted back pain attributed to an injury in "Jan[uary] 2018." *Id.* at 4. His neurological examination was normal, and he was discharged with instructions to follow up with his primary care physician ("PCP"). *Id.* at 5.

An email from March 2, 2018, reveals that Mr. Darby told a colleague that he had "developed significant weakness in both legs acutely" and was going to be re-evaluated. Ex. 13 at 3. The same day, he presented to a treater at the hospital where he worked and reported "some rectal and bladder 'urgency'" that began a "few weeks after" his January 2018 back injury (attributed to a snowblower) but that resolved within four to five days of

said injury. *Id.* By the end of January, Mr. Darby recalled, he had "trouble getting out [of] the airplane seat." *Id.* "A few weeks ago" he fell while snowshoeing and noted his legs ached. *Id.* Two weeks ago, he noticed "decreased power" in his legs bilaterally that "progressed to a feeling 'like [his] legs [we]re disconnected." *Id.* Mr. Darby noted that he could still exercise at the time of this visit but reported his leg symptoms had progressed to the point that they were noticeable "[o]ver the past few days." *Id.* Mr. Darby did not describe the onset of these symptoms with more specificity during that appointment.

On March 5, 2018, Mr. Darby had a visit with his PCP. Ex. 18 at 3. He now noted that during the "1st weekend of Jan." (after snow blowing) he had low back pain "with no assoc[iated] neurologic [symptoms]." *Id.* "Within a few days" he had a "burning sensation" in his rectum and bladder "with some urgency – [which] lasted for about 2 w[eeks.]" *Id.* He also described the progression of his leg symptoms/weakness consistent with that above. *See id.*

Mr. Darby had a neurology consultation for leg weakness on March 8, 2018. Ex. 6 at 2. Mr. Darby reported that "the insidious onset and progression of a number of symptoms, predominantly in his legs[,]" began "[o]ver the last 3 or 4 weeks." *Id.* In "the last few days [he has] had some more pronounced true numbness and paresthesias involving the entirety of both legs" and "[o]ne week ago . . . his legs felt notably weak and 'dead.'" *Id.* His neurological examination was largely normal, with "[p]erhaps a hint of slightly increased leg tone . . . [s]lightly brisk [deep tendon reflexes] at the knees and ankles[,]" and "[a]t least some loss of vibratory sensation [at the] ankles and knees." *Id.* at 4. The neurologist did not make a diagnosis but ordered further imaging and a lumbar puncture. *Id.* at 5, 8, 36.

The lumbar puncture revealed elevated protein and Mr. Darby was treated with a dose of IVIG. Ex. 6 at 8, 36; Ex. 5 at 151. A March 14, 2018 EMG was normal and Mr. Darby was told "there [wa]s no evidence of neuropathy such as [GBS], motor neuropathy/ALS, or myopathy." Ex. 6 at 30-31.

By March 21, 2018, Mr. Darby had begun "complain[ing] of more cognitive issues," (including with short term recall, difficulty finding words, issues with higher executive function, worsened anxiety, fatigue, and occasional slurred speech,) and his recent brain MRI showed nonspecific biparietal white matter lesions. Ex. 6 at 34-36. Dr. Muscat thought Mr. Darby's "[s]ituation remain[ed] somewhat enigmatic." *Id.* at 37.

Mr. Darby sought care with another neurologist on March 26, 2018. Ex. 6 at 53. This neurologist opined that Mr. Darby's clinical history and elevated protein levels were "suggestive of an autoimmune/inflammatory process but testing has failed to determine a specific cause." *Id.* at 57. Mr. Darby was assessed with acute inflammatory

5

demyelinating polyneuropathy ("AIDP") with abnormalities "to [sic] mild to show up on EMG testing." *Id.* at 58.

On April 12, 2018, Mr. Darby returned to his original neurologist reporting a "major new issue" of "pretty severe generalized abdominal pain accompanied by nausea, bloating, [and] a sense of fullness" that began "several days ago." Ex. 6 at 71. He also reported urinary frequency and urgency. *Id.* The treater opined that Mr. Darby's clinical presentation, imaging, and lab findings "all argue strongly against demyelinating disease." *Id.* at 73.

Mr. Darby had an appointment with a third neurologist on April 18, 2018. Ex. 7 at 2. After a review of Mr. Darby's medical history, this neurologist's impression stated, "about a month or so after a flu vaccine, [Mr. Darby] developed paresthesias and a feeling of weakness in his extremities." *Id.* at 5. The treater opined that his clinical findings and presentation "may very well have been a sensory predominant [GBS] . . . [but w]hat he is left with are potentially some autonomic sounding symptoms, may be overlap with small fiber neuropathy" and dysautonomia. *Id.* The neurologist ordered further testing for suspected small fiber neuropathy, autonomic dysfunction, and/or GBS. *Id.*

A repeat EMG performed on April 27, 2018, was largely unchanged, but "a sensory neuropathy could not be fully ruled out," and there was "no denervation or other evidence of an inflammatory demyelinating polyneuropathy nor any acute denervation changes." Ex. 6 at 80, 83-84.

During a follow-up appointment with Mr. Darby's original neurologist on May 24, 2018, the neurologist informed Mr. Darby that his skin biopsy to test for small fiber neuropathy revealed reduced small fiber nerve density. Ex. 6 at 108. The neurologist opined that Mr. Darby's "situation seem[ed] most consistent with an autoimmune process involving the nervous system," with "fluctuating cognitive symptoms; fairly prominent anxiety; additional involvement of autonomic nervous system/peripheral small fibers," but without evidence of a "more widespread systemic disease." *Id.* The treater told Mr. Darby that they had "reached the end of diagnostics here." *Id.*

A June 4, 2018 email to his PCP reveals that Mr. Darby reported becoming "symptomatic in [the] last week of February" of 2018. Ex. 2 at 22. Specifically, he wrote that as of February 6, 2018, he was "well and indeed fully at work and travelling [sic] in Hawaii the last week of February." *Id.* He then "[b]ecame symptomatic very quickly in those 2 weeks." *Id.*

Mr. Darby was evaluated by a fourth neurologist on June 12, 2018. Ex. 8 at 2. Mr. Darby reported "a history dating back to March [of 2018]." *Id.* The treater noted that Mr.

6

Darby had a flu vaccination in December 2017, and "[i]n January sometime towards the end of that month, he had burning pain in his pelvis that resolved." *Id.* This neurologist thought that Mr. Darby's history "sound[ed] very [sic] like a sensory and autonomic predominant form of [GBS]." *Id.* at 3. He further opined Mr. Darby may have experienced IVIG induced aseptic meningitis that "further clouded the picture." *Id.*

On July 10, 2018, Mr. Darby tragically committed suicide. Ex. 10 at 26. The brain autopsy noted that Mr. Darby "reportedly had a para-infectious AIDP syndrome and developed symptoms of [IVIG] related headache, post-treatment." Ex. 12 at 4. The brain autopsy further noted age-related findings without demyelination but "mild-to-moderate inflammation affecting both central and peripheral portions of assessed cranial nerves." *Id.* This finding was considered "not diagnostic of a para-infectious immune response, [but] would be consistent with a centrally expanding autoimmune polyneuropathy." *Id.*

### III. Reasonable Basis

### A. Legal Standard

Motivated by a desire to ensure that petitioners have adequate assistance from counsel when pursuing their claims, Congress determined that attorney's fees and costs may be awarded even in unsuccessful claims. H.R. REP. NO. 99-908, at 22 *reprinted in* 1986 U.S.C.C.A.N. 6344, 6363; *see also Sebelius v. Cloer*, 133 S.Ct. 1886, 1895 (2013) (discussing this goal when determining that attorneys' fees and costs may be awarded even when the petition was untimely filed). This is consistent with the fact that "the Vaccine Program employs a liberal fee-shifting scheme." *Davis v. Sec'y of Health & Hum. Servs.*, 105 Fed. Cl. 627, 634 (2012). Indeed, it may be the only federal fee-shifting statute that permits *unsuccessful* litigants to recover fees and costs.

However, Congress did not intend that *every* losing petition be automatically entitled to attorney's fees. *Perreira v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994). And there is also a prerequisite to even obtaining fees in an unsuccessful case. The special master or court may award attorney's fees and costs to an unsuccessful claimant only if "the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." Section 15(e)(1). Reasonable basis is a prerequisite to a fee award for unsuccessful cases – but establishing it does not automatically *require* an award, as special masters are still empowered by the Act to deny or limit fees. *James-Cornelius on behalf of E.J. v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374, 1379 (Fed. Cir. 2021) ("even when these two requirements are satisfied, a special master retains discretion to grant or deny attorneys' fees").

As the Federal Circuit has explained, whether a discretionary fees award is appropriate in an unsuccessful case involves two distinct inquiries, although here only reasonable basis is at issue.[6] Reasonable basis is deemed "an objective test, satisfied through objective evidence." *Cottingham v. Sec'y of Health & Hum. Servs*., 971 F.3d 1337, 1344 (Fed. Cir. 2020) ("Cottingham I"). The reasonable basis requirement examines "not at the likelihood of success [of a claim] but more to the feasibility of the claim." *Turner v. Sec'y of Health & Hum. Servs*., No. 99-0544V, 2007 WL 4410030, at *5-6 (Fed. Cl. Spec. Mstr. Nov. 30, 2007) (quoting *Di Roma v. Sec'y of Health & Hum. Servs.,* No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)). The Federal Circuit recently explained "that a reasonable basis analysis is limited to objective evidence, and that subjective considerations, such as counsel's subjective views on the adequacy of a complaint, do not factor into a reasonable basis determination." *James-Cornelius*, 984 F.3d at 1379.

Although clearly easier to meet than the preponderant standard required for compensation, "courts have struggled with the nature and quantum of evidence necessary to establish a reasonable basis." *Wirtshafter v. Sec'y of Health & Hum. Servs.,* 155 Fed. Cl. 665, 671 (Fed. Cl. 2021). "[I]t is generally accepted that 'a petitioner must furnish some evidence in support of the claim.'" *Id.* Citing the *prima facie* elements of a successful claim described in Section 11(c)(1), the Federal Circuit recently instructed that the level of the objective evidence sufficient for a special master to find reasonable basis should be "more than a mere scintilla but less than a preponderance of proof." *Cottingham I*, 971 F.3d at 1345-46. "This formulation does not appear to define reasonable basis so much as set its outer bounds." *Cottingham v. Sec'y of Health & Hum. Servs.,* 159 Fed. Cl. 328, 333, (Fed. Cl. 2022) (*"Cottingham II"*), *aff'd without op.*, 2023 WL 754047 (Fed. Cir. Nov. 14, 2023). "[T]he Federal Circuit's statement that a special master 'could' find reasonable basis based upon more than a mere scintilla does not mandate such a finding." *Cottingham II*, 159 Fed. Cl. at 333 (citing *Cottingham I*, 971 F.3d at 1346).

Furthermore, the issue of reasonable basis is not a static inquiry. The reasonable basis which existed when a claim was filed may cease to exist as further evidence is presented. *Perreira*, 33 F.3d at 1377. In *Perreira,* the Federal Circuit affirmed a special master's determination that reasonable basis was lost after Petitioner's "expert opinion, which formed the basis of the claim, was found to be unsupported by either medical literature or studies." *Id.* at 1376.

---

[6] Claimants must also establish that the petition was brought in good faith. *Simmons v. Sec'y of Health & Hum. Servs*., 875 F.3d 632, 635 (Fed. Cir. 2017) (quoting *Chuisano v. Sec'y of Health & Hum. Servs*., 116 Fed. Cl. 276, 289 (2014)). "[T]he 'good faith' requirement  . . . focuses upon whether petitioner honestly believed he had a legitimate claim for compensation." *Turner v. Sec'y of Health & Hum. Servs*., No. 99-0544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). But good faith is not disputed herein, and I do not ascertain evidence in the record calling it into question.

For a GBS Table injury, onset must occur within three to 42-days post-vaccination. 42 C.F.R. § 100.3(a)XIV(D) (2017). Importantly, that timeframe reflects an intentionally-generous broadening of the period in which vaccine-associated GBS is expected by applicable medical science to *most likely* occur. *See,* e.g., *Pierson v. Sec'y of Health & Hum. Servs.,* No. 17-1136V, 2022 WL 322836 (Fed. Cl. Spec. Mstr. Jan. 19, 2022) (discussing the two seminal studies by Schonberger and Langmuir, et al. (relied upon in promulgating the Table timeframe for a GBS injury caused by a flu vaccination) and noting that Schonberger "observed that the expected peak onset [of GBS] occurred 16 to 17 days post-vaccination, though the majority of all GBS cases . . . *began within four weeks*" (emphasis added)), with Langmuir expressing a preference for likely onset "up to 42 days" post-vaccination); *see also National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking*, 80 Fed. Reg. 45132-01 at *45145 (July 29, 2015) (emphasis added). Thus, although a person's flu-vaccine-caused GBS would likely manifest well sooner than six weeks post-vaccination, HHS promulgated a broader period for purposes of crafting a fair Table claim. And it is not the case that an individual's risk is *consistent* throughout the 3-42 day timeframe, even if it is possible a later onset could be vaccine-associated.

For a non-Table injury, "a showing of a proximate temporal relationship between vaccination and injury" is required to meet the third *Althen* prong. *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005) (setting forth the three-pronged test for causation). Thus, when petitioners claiming GBS due to a flu vaccine cannot meet the Table onset timeframe, their subsequent success is a function of *when* onset occurred, and whether the facts of the case (coupled with a persuasive and reliable expert opinion) allow them to successfully establish a medically-acceptable timeframe.

In some cases, a claimant is tasked with preponderantly establishing the medical acceptability of a close-in-time onset to vaccination. This can be difficult to do. *See,* e.g., *Rowan v. Sec'y of Health & Hum. Servs.,* No. 17-760V, 2020 WL 2954954, at *16-19 (Fed. Cl. Spec. Mstr. Apr. 28, 2020) (finding a GBS onset sooner than three days post vaccination was not scientifically or medically supported by the record, given that GBS is known to be mediated by antibodies produced via the adaptive immune system, and this process takes longer than 3 days to result in symptoms); *Orton v. Sec'y of Health & Hum. Servs.*, No. 13-631V, 2015 WL 1275459, at *3-4 (Fed. Cl. Spec. Mstr. Feb. 23, 2015) (finding a one-day onset of GBS following a flu vaccination was not substantiated by the evidence).

Nevertheless, Petitioners have succeeded in defending short onsets. *See,* e.g., *Lehrman v. Sec'y of Health & Hum. Servs.*, No. 13-901V, 2018 WL 1788477, at *14-19 (Fed. Cl. Spec. Mstr. Mar. 19, 2018) (finding entitlement for a petitioner who established a pre-vaccination history of an upper respiratory infection, which, *in combination with the*

*flu vaccination,* was found to have resulted in an upregulation of the petitioner's immune system that led to a rapid onset of GBS and thus a 1-day onset was appropriate). Resolution of such cases often comes down to whether a claimant's personal health circumstances and facts make it more likely an aberrant immune response would have occurred sooner than usual (since it is understood GBS is likely instigated by autoantibody cross-reactive attack on nerve myelin, and those antibodies are usually produced by the adaptive leg of the immune system, which occurs in a longer timeframe).

On the other hand, a "too-long" onset (beyond the Table's 42-day/six week window) can be even harder to establish as medically reliable. GBS is understood to present in an acute and monophasic matter, and as time passes from the date of vaccination, the likelihood that the flu vaccine initiated a process of production of autoantibodies capable of harming nerve myelin declines. While it is not the case that as of day 43 it automatically becomes *unlikely* the vaccine was associated with a claimant's prior GBS, a claimant cannot "borrow" the Table period, relying on how close they are to its limit to satisfy the third *Althen* prong. *See,* e.g., *Greene v. Sec'y of Health & Hum. Servs.,* No. 11-631V, 2019 WL 4072110, at *16 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (finding that the petitioner could not meet his burden of proof under *Althen* prong three by relying on the relatively-short day differential between the end date for a viable Table claim and his own onset); *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1147–48 (Fed. Cir. 1992) ("[s]imple similarity to conditions or time periods listed in the Table is not sufficient evidence of causation").

Another dilemma in cases involving lengthy post-vaccination GBS onset timeframes is how the Program has treated such cases. I have previously noted that eight weeks (56 days) is about the furthest out special masters have been willing to go and still find onset was medically acceptable – and even that is not a given. *See generally Chinea v. Sec'y of Health & Hum. Servs.,* No. 15-0095V, 2019 WL 1873322, at *29 (Fed. Cl. Spec. Mstr. Mar. 15, 2019) (citing *Barone v. Sec'y of Health & Hum. Servs.*, No. 11-0707V, 2014 WL 6834557, at *13 (Fed. Cl. Spec. Mstr. Nov. 12, 2014)). Entitlement has unquestionably been denied when onset occurred well beyond two months after vaccination. *See,* e.g., *Williams v. Sec'y of Health & Hum. Servs.,* No. 19-1177V, 2021 WL 815921, at *5 (Fed. Cl. Spec. Mstr. Jan.19, 2021) (GBS onset of more than three months after vaccination not medically acceptable); *Aguayo v. Sec'y of Health & Hum. Servs.*, No. 12-563V, 2013 WL 441013, at *3 (Fed. Cl. Spec. Mstr. Jan. 15, 2013) (rejecting a latency of three- and one-half months for GBS onset).

It thus becomes highly unlikely, regardless of Schonberger, that post-flu vaccine GBS beginning later than 56 days can be preponderantly shown to be medically acceptable. I myself have rejected onsets comparable to what Petitioner experienced. *See,* e.g., *Kindle v. Sec'y of Health & Hum. Servs.*, No. 20-1423V, 2025 WL 603690 (Fed.

Cl. Spec. Mstr. Jan. 21, 2025) (65-day GBS post-vaccination onset too long to be medically acceptable), *mot. for review den'd,* 177 Fed. Cl. 689 (2025).

### B.      Existence of Reasonable Basis

The objective evidence in this case, including Petitioner's own contentions, establishes that Mr. Darby likely suffered the onset of GBS (as evidenced by actual neurologic symptoms – as opposed to nonspecific infectious symptoms like those pertaining to the flu or URI) no sooner than mid-late February 2018, leading up to his March 2, 2018 neurology evaluation. This date was *over nine weeks* after his December 11, 2017 vaccination, and around the same time that he reported experiencing a URI. Petitioner otherwise acknowledges an onset that occurred approximately 64 days (or nine weeks and a day) following Mr. Darby's receipt of the subject flu vaccine. *See,* e.g., Mot. at 5.

Despite such a long timeframe, Petitioner contends that other special masters have credited Schonberger as supporting a causal connection between the flu vaccine and onset of GBS of up to *ten weeks* (or 70 days) post-vaccination. Mot. at 6. But this is a slight exaggeration. At most, decisions have *referenced* Schonberger as supporting (in some unusual cases) onsets falling *beyond* the 42-day Table timeframe, while also noting a general unwillingness to go beyond 56 days/eight weeks. *See,* e.g., *Redzepagic v. Sec'y of Health & Hum. Servs.*, No. 19-853V, 2025 WL 1147520 (Fed. Cl. Spec. Mstr. Mar. 19, 2025) (finding that the petitioner's onset of GBS was within 46 days of vaccination and thus sufficient to establish a causal relationship, while acknowledging the expert for the petitioner had relied on Schonberger to defend onset); *Pierson*, 2022 WL 322836 (acknowledging that "there is some limited, albeit not preponderant, evidence from Schonberger to suggest onset could potentially exceed eight weeks[,]" but that other evidence supported the finding that the petitioner's Prevnar-13 vaccine caused her GBS within 56 days of vaccination (eight weeks)).

As Petitioner notes, however, another special master addressed the results of Schonberger in *Cooper v. Sec'y of Health & Hum. Servs.*, and found that its findings "cannot be entirely disregarded." *See* No. 18-1885V, 2024 WL 1522331 (Fed. Cl. Spec. Mstr. Mar. 12, 2024). *Cooper* deemed a *60-day* latency for onset to be "on the *very edge* of the *entirely undisputed* eight-week latency period" for the post-vaccination onset of GBS, but still found it to be medically acceptable. *See* 2024 WL 1522331, at *20 (emphasis added).

11

Petitioner has provided no comparable case law[7] to support her position that an even longer onset should *also* be considered medically acceptable, but *Cooper* does indicate that some special masters are prepared to consider extreme onsets of this kind reasonable. And as already noted, there is some willingness on the part of certain special masters to entertain onsets falling in the six to eight-week post-vaccination interval.

I am skeptical that even an eight-week onset is more likely than not medically acceptable, and would not likely so find unless some hitherto-unpublished item of literature reflecting new research on the topic suggested as much.[8] I also do not agree (*contra Cooper*) that the special masters (in the course of resolving failed flu vaccine-GBS Table cases) have informally "agreed" that onsets exceeding the Table limits by two weeks are still medically acceptable – even if Schonberger (a study that is nearly 50 years old) can be read to support that conclusion. The purpose of the Table claim for GBS due to the flu vaccine would be effectively defeated if the special masters in their decisions could informally stretch the timeframe element in this manner (especially since a 42-day onset is *itself* not as likely when vaccine causation is at issue than a two to three-week post-vaccination onset).

Nevertheless, for the purposes of this case, and despite the fact that the Petitioner's claim was self-evidently *highly* unlikely to succeed given the onset at issue, I deem this claim to possess reasonable basis. Objective evidence established the injury and fact of vaccination, and there was the slightest of chances the claim could have succeeded, given the outlier decisions finding long GBS post-vaccination onsets to be medically acceptable. While attorneys should be more prepared to advise clients against attempting this kind of claim when onset is so long after vaccination, there exists some prior Program determinations supporting the bringing of the claim. Accordingly, *in this matter* I will find fees appropriate (although present counsel – or any other Program counsel for that matter – should not again receive fees in any failed Table GBS claim where onset exceeds eight weeks absent strong medical or scientific proof updating Schonberger's proposed findings to the 21st Century).

---

[7] *See,* e.g., Mot. at 5-7; Reply at 3-5.

[8] *See,* e.g., *Morris-Mazzetti v. Sec'y of Health & Hum. Servs.,* No. 22-260V, 2026 WL 1470263 (Fed. Cl. Spec. Mstr. Apr. 22, 2026) (dismissing a flu-GBS Table claim where the onset was 64 days post vaccination, and cautioning the petitioner that even considering outlier circumstances, I was "not aware any case in which a special master recognized an onset of longer than 60 days post-vaccination") (quoting *Kindle,* 177 Fed. Cl. at 713, n.23).

## IV.    Appropriate Amount to be Awarded

### A.    Legal Standard

Counsel must submit fee requests that include contemporaneous and specific billing records indicating the service performed, the number of hours expended on the service, and the name of the person performing the service. *See Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 316-18 (2008). Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). It is "well within the special master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Id.* at 1522. Furthermore, the special master may reduce a fee request *sua sponte*, apart from objections raised by respondent and without providing a petitioner notice and opportunity to respond. *See Sabella v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 201, 209 (2009). A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 729 (2011).

### B.    Attorney's Fees and Costs

The billing records reveal Petitioner is requesting fees calculated using hourly rates previously approved for all attorneys and paralegals who performed work in this case. *See, e.g., Phelan on behalf of A.P. v. Sec'y of Health & Hum. Servs.,* No. 18-1366V, 2025 WL 1453777 (Fed. Cl. Spec. Mstr. Apr. 30, 2025) (awarding counsel's requested rates for work performed through 2024). And I do not find Petitioner's counsel's requested rate of $594.50/hour for work performed in 2025 to be unreasonably high, in light of counsel's prior awarded rates for work performed in the Program (i.e., awarding $553.50/hour for work performed in 2024). *See id.* I also credit Petitioner for withdrawing her request for fees incurred from July 2020 to March 2023, as recognition that counsel "accomplished very little" between the time this claim was initiated and my issuance of the aforementioned Order to Show Cause. *See* Reply at 8 (reducing her $36,050.55 request for fees by $9,529.80, for a total of $26,520.75). And counsel is not seeking reimbursement of any costs. *See* Mot. at 2.

Nevertheless, I deem this a matter in which time generally spent on it was not reasonable. Counsel is an experienced Vaccine Program practitioner who should have known that such a lengthy onset was not likely to result in a favorable determination. This is not a case in which the onset simply exceeded the 42-day Table cut-off by a week or two. And the issues with this should have been evident early on in the matter.

In light of the above, I find an overall **50% reduction in fees** is warranted (in keeping with my discretion to make across-the-board cuts, rather than letting fees litigation become a secondary pursuit). *See James-Cornelius*, 984 F.3d at 1379 (reasonable basis is a prerequisite to a fee award for unsuccessful cases – but establishing it does not automatically *require* an award, as special masters are still empowered by the Act to deny or limit fees). **This results in a reduction of $13,260.38.**[9]

I again emphasize that future claims of GBS caused by the flu vaccine where Table onset cannot be met should not be brought at all unless onset falls within eight weeks of vaccination (or where a reasonable fact question about onset is presented). Counsel will bear the burden of doing sufficient due diligence in such cases, and they will risk their fees entirely if they proceed regardless.

### Conclusion

I have determined that an award of reasonable attorney's fees and costs is appropriate in this case even though compensation was not awarded. Section 15(e)(1). Accordingly, I hereby **GRANT** Petitioner's motion for attorney's fees and costs and award a total of **$13,260.38 (representing attorney's fees) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement.** The Clerk of the Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[9] This amount is calculated as follows: $26,520.75 ÷ 2 = $13,260.375 (rounded to $13,260.38).

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.